Madison Financial v. Hunts Point Cooperative Market  Jim Perkins from Greenberg Trowrig in New York City on behalf of the appellant to the Hunts Point Cooperative Market. I would like to reserve three minutes for rebuttal. You may. This appeal concerns the applicability of the New Jersey Uniform Commercial Code, Chapter 9, Section 403B, the Bonafide Purchaser Statute, as it applies to instruments called Notices of Purchase of Accounts Receivable that were executed in connection with the factoring of financing of accounts receivable. Westway, the contractor, purportedly sold to Madison Financial certain accounts that it was to receive from Hunts Point, a project owner, which had hired Westway to perform work. In Madison's action to enforce the Notices of Purchase, Hunts Point raised the defense that the construction invoices that had been incorporated by reference into the Notices of Purchase were fake and that Madison knew it and, therefore, that under 9403B, Madison Financial could not be a holder in due course and, therefore, Hunts Point could raise its defenses against Madison. But Reingold signed those. Reingold, who was the Hunts Point employee, signed off on those Notice of Purchases, right? That's correct, Your Honor, and the question from our perspective is not the fact that he signed it. He didn't dispute that he signed it, although he disputes the context in which he signed it. But the issue on appeal, the important issue on appeal, is whether or not Hunts Point would be permitted to assert the Bonafide Purchaser defense, notwithstanding the fact that they signed it. In fact, in all of these types of cases, these issues wouldn't come up unless an instrument had been signed by the account debtor. There is a case... Isn't he deemed... I mean, the information was in there. Isn't he deemed to have read it? And the fact that he says, I didn't read it, I signed it... I mean, there were five of these, right? Five? There were five that were signed on three different occasions. Yeah, so why isn't that dispositive? It's not dispositive because 9403B gives an answer under the Uniform Commercial Code. What it says is, if an account debtor signs a document that says, I have no defenses to the payment of these accounts receivable, if the assignee doesn't take those in good faith, which we argue they had not taken them in good faith, that we're permitted then to raise our defenses, that that waiver of defenses is no good, and we're permitted, under the common law of assignment, to raise the defenses that Hunts Point had against Westway. Thank you. And there was undisputed testimony at trial that Westway defaulted under its construction contracts in an amount that far exceeded this million dollars that Madison is trying to seek to recover against Hunts Point. Hunts Point at trial really raised two principal arguments. One, that the invoices were fake, and two, that Mr. McGuire, who was delegated the day-to-day responsibilities of managing Madison Financial and its factoring operations, was engaged in a fraudulent scheme. And even Madison's own quiet investor, Mr. Marazzi, conceded that Mr. McGuire was involved in a fraudulent scheme involving the Westway factorings. But is that criminal conduct appropriately attributed to the corporation? Yes. Why? The reason being, and we cite a number of cases and we develop it more in our reply brief, is that Mr. McGuire was delegated all of the responsibility, the day-to-day operations to manage the factoring transactions. And what the case law says is that if there is a broad delegation like that, that even if the conduct is criminal, that it is attributable to the corporation. And in this particular instance, for example, one of the issues at trial was Mr. McGuire's endorsement. It was either Mr. McGuire or Mr. Sneddon, his father-in-law, endorsement of checks that Hunts Point had paid to Westway, which were negotiated over, in most cases over to Madison, but in some cases over to Service Capital, which was a member. Now Madison said that that was a diversion of funds. And what Hunts Point says is that it should have been given credit for those alleged diversion of funds because Mr. McGuire had been delegated the power of attorney to endorse checks on behalf of Madison. And that those endorsements occurred in the ordinary course and that, so to answer your question, even though criminal, they still should have been attributable to the corporation. And we believe that the district court failed in that respect to recognize that entire doctrine of the acts of the, effectively the principle of the corporation being imputed to the corporation, notwithstanding the fact that they were criminal. Now the district court didn't really address the Article 9 situation. You mentioned it in a footnote, as I gather, where he said that the damages, any damages that might accrue from violation of Article 9 would be any greater than a breach of contract damages, I guess. That's correct, Judge. And we were also trying to figure out what the lower court did with Article 9. And it was certainly clear from that footnote that they said, well, I'm not going to decide to claim that they had brought under Article 9. But that did not excuse the court from failing to consider the defense. Just because there is a common law claim doesn't mean that the account debtor is not entitled to assert the Article 9 defense. In fact, on the face of the statute, it says that this statute applies to all accounts receivable transactions. That's what the statute says. It applies to the sale of accounts. And two cases that were decided in 2008, one state court and one federal court that were decided just last year, one of those cases, 21st Capital Corp., which is a New Jersey superior court, which is an appellate court decision, seems to me to be right on point because it was the same type of transaction, where it was a factoring of accounts receivable, where there was this verification signed by the account debtor that said that there were no claims or defenses and the money was due an owing. That case also happened to involve fake invoices, just like this case. And the argument that was made by the plaintiff in that case was the same argument that the lower court adopted. And that was, I don't want to hear about whether or not the documents were fake. If it says on the face of the instrument that the money is due an owing, that's all I need to know. If it lists the amount of money that's owed, and the superior court in New Jersey rejected that argument. They called it untenable as a matter of law. If there are fake invoices, and the evidence in that case showed they were fake, and we believe also that the evidence we showed that the invoices were fake, essentially it went unchallenged in the district court. And you'll hear Madison's argument about why these invoices should be disregarded and you have to look at the notices of purchase. And we believe that the district court's failure to analyze this under 9403B was a reversible error of law. Under 9403B, we believe that under the bona fide purchaser provisions, that Madison could not be held to have taken these instruments in good faith. In good faith means that they acted honestly in fact, and that they also observed reasonable commercial standards of fair dealing. And we believe that the record is replete, and we have a number of these things listed in our papers that show not only did Madison know that the invoices were fake, but they serially disregarded their own procedures that they had set up for factoring transactions on a continuous basis. Now, there is a debate in the briefs about at what point in time do you look to determine whether or not they've observed reasonable commercial standards. Madison takes the view you look at the time that they signed the instrument. Well, we take that view also, but we take the view that it's cumulative. You have to look at the conduct of how they conducted their business over a period of time. And in the Craftsman-Container case, which was decided before the amendments, and they looked at it in terms of bad faith, Craftsman-Container said, well, we're going to look at the relationship between the bank that was involved in that case and its customer over a period of four years to determine whether or not they acted in good faith. This court in the McAdam case has held that if there is a serial and deliberate disregard of procedures, that that's enough to defeat the bona fide purchaser status. One of the other errors that we assign to the lower court is its finding that the fact that the invoices were not attached to the notices of purchase to be immaterial. That is the word that the lower court used, and they addressed it in a footnote. We submit that it is not immaterial, that it was highly material, that those were not attached, and they were not attached for good reason, because they were fake. And had Hunt's point had the benefit of having those attached when they signed the notices of purchase, this whole thing probably would have been uncovered. Did they show on their face that they were fake? Yes. In other words, how would Reingold, for example, who signed for them, would he have known if the invoices were fake? Yes, Judge, he would have known, because the construction requisitions were very elaborate. They are also in the record. There are multiple pages.  There were sign-offs by the government of New York. This was a New York-funded construction project. The invoices that were factored were single-page documents, no sign-offs. But to answer the question, how could you tell from the face of the documents that they were fake, Madison had in its possession these invoices that it factored, and on the invoices, they factored three invoices that showed that Hunt's point had made payments on the invoices, and yet Westway told them at the beginning of April 2000, well, we're not going to get paid from Hunt's point until the end of April. And yet during the month of April, they had three invoices exceeding a million dollars that showed on them payments by Hunt's point, and yet they factored them. They factored them. The other thing that you could tell, and this is the last point and I'll sit down. No, that's all right. I have a question when you finish. Okay. That you could tell that the invoices were fake was that the notices of purchase that were signed were dated before three of the invoices. So three of the notices of purchase were dated before the invoices, and the notices of purchase, what they say is the money, the amounts are owed pursuant to the attached invoices. So how could you have monies owed pursuant to the attached invoices when they're dated later in time? So the answer to your question is yes, on their face you could tell that they were fake. There is another. Is that a matter of, are you saying that is a matter of law? Does a fact finder have to make that decision? Well, it's a question of fact, Judge. Obviously, you have to make a factual determination. Unfortunately, the district court didn't decide this issue at all. So we are left with no ability to determine whether it was properly analyzed. Okay. Now I can ask my question if I may. I don't understand something. The district court, Judge Walz, said that if one were to proceed under a promissory estoppel theory, then the damages would have been only $239,734, but the amount that he awarded on the contract theory was $1,010,435. Can you explain? Yes, Judge. I can. It's a matter of the way the factoring transactions worked. The way they worked was an invoice was presented. Let's say that one was $100,000. The factor would give $70,000 in payment. And when the full invoice was paid to the factor, the factor would then give the $30,000 it held back, back to the company, to its customer. And what happened here was the reason that the Less fees. Less fees, that's correct, and penalties depending on how long the invoices were unpaid. So that is correct. And the reason the district court said the reliance damages are $200,000, that is the amount of money that Madison Financial is actually out of pocket. The other amount that they're seeking of this million dollars is their profit. They're trying to get the profit from Hunt's Point. And I see my time is up and I've reserved a little time. You were on our time. Thank you. Any other questions? Mr. Perkins, thank you. Thank you. Mr. Werbin. Good afternoon, Your Honors. Good afternoon. I appreciate the opportunity to be here. I'm Barry Werbin from Herrick Feinstein from Madison Financial, LLC, appellee and appellant on the cross appeal with respect to prejudgment interest. Sometimes, Your Honors, even as lawyers, we miss the forest for the trees. So let me jump in and address the seminal issue in this case, which is whether Hunt's Point can assert UCC 9403 defenses to a common law breach of contract action. And the answer is unequivocally it cannot, and the district court did not err, therefore, in its opinion. And the answer is on the face of 9403 Subdivision B, Subdivision F, and also Official Comment 6, which I apologize is actually not referenced in our brief, but it's part of the statute of official comments. 403B expressly refers only to an agreement between the account debtor and the assignor, NOR. That means, in this case, Hunt's Point and Westlake. It does not mean the assignee of the accounts, which was Madison. 403F states that this section does not displace other law. So what does that mean? If you look at Official Comment 6, it says, an example of other law, and this is right in the comment, is a separate agreement between the account debtor and an assignee, which is in italics in the comment, waiving claims and defenses, which is exactly what we have here. So this statute was designed not for a factoring situation per se, but, for example, where equipment leases or other accounts were in the agreement between the account debtor, excuse me, and let's say the contractor or the assignor of the account, there was language that waived defenses. So, in effect, when the assignor went to its financier, its factor, the factor in that case would be like a third-party beneficiary, and absent a separate enforceable contract between the factor, the assignee of the accounts and the account debtor, the factor would then have to rely on the waiver of defenses in that agreement between the account debtor and the assignor. That's what the statute says. That's what it means. And that's why the district court didn't have to go there, because all those bona fide defense issues, which we submit would still not give Hunt's point of claim, even as this case were not decided as a breach of contract action, do not apply as a defense against a common law breach of contract. You look like you're about to ask a question, Judge Bishop. Sorry. So I'm hoping this clarifies it, because it was torturing me, you know, throughout this case, and sometimes, as I said, we miss the obvious when we try to think too much about it. It's right there in the statute. The district court properly found that there was a valid contract each time Mr. I think it's very important here. Each of the five notices of purchase, five times, and that there was consideration supporting each one of those. There was no waiver, and there was no absence of material terms. I'd just like to address each of those briefly. I think we all know we learned. They say in their brief that there was no consideration, because they would have been obliged to pay anyway, even with that, as I understood. Am I wrong? Well, that's their argument, Judge Slover, but the fact is, and the district court found this is a factual finding, that there was independent consideration, because in the context of this project, Hunts Point had to get funding from the New York City and state agencies. There were delays of 30 to 60 days in getting that funding. That was delaying Hunts Point making payments to its contractors, including Westway. Mr. Rheingold admitted at trial that if you looked at the trade contracts between Hunts Point and Westway, that would not appear. You would not see that delay in that contract. So that was creating a payment problem for Westway, as well as for Hunts Point getting the project done, because the contractor doesn't want to work if they're not getting paid timely. So Mr. Rheingold expressly admitted at trial he knew that this funding was going to enable Westway to get financing from a third party, that that was going to be helpful for Westway to move the project, and it was going to significantly be of benefit to Hunts Point. So he admitted there was consideration, and the district court found that just by virtue of the delay in Hunts Point getting payment from the city, its obligation to pay the contractor was now supplanted by Madison's undertaking to pay, which alleviated the immediacy and the burden on Hunts Point because it was having payment problems, and that was sufficient consideration. That was unrelated to any existing obligation Westway had here. Who should bear the risk of McGuire's criminal conduct? Isn't that a policy issue that underlies some of this? Should it not be the employer who put him in the position where he could do this, which would be Madison? Your Honor, first, I don't think it's a policy issue, and I would not agree with that position because this is not a case. I remember in tort law, the modern tort law looks at who should bear the risk. Right. But the risk here you have to look at what was the interaction. The interaction was never Hunts Point interacting with Mr. McGuire. Never. Mr. Reingold said he never even spoke to anybody at Madison, although the testimony and the finding was that Mr. Sneddon called him to ---- There was a phone call. Sorry? There was a 52-second phone call. Right. There was a phone call which the district court accredited, which was Mr. Sneddon for the first invoice, which was his policy to always call with respect to the first notice of purchase to verify the signature, verify that the account debtor would make the payment to Madison. But I want to answer your question because it's a very important question. There was no evidence in the record that Mr. McGuire or Mr. Sneddon knew that the invoices were false. My learned colleague says that, and Hunts Point says that in the brief, but there's no evidence admissible in the record that shows they in fact knew that, and they both denied it. In fact, they insisted Mr. McGuire be brought in from prison to testify, and they asked him that question. He said, I didn't know. Now, you could take that with a grain of salt. But there was no evidence that they knew. So who made the ---- who did the false invoices? Well, Westway. If there was anyone who was wrong here, it was Westway. And Hunts Point also admits in its brief that they're not claiming that Madison was guilty of fraudulent inducement because they didn't plead that as an affirmative defense and they didn't try it. So they can't allege that here. And that would be a defense to a contract action. So that's not a defense to the contract action. Who in Westway? But why did McGuire go to jail then? He actually, to answer your question, it's in the record, his indictment and his conviction was based on theft of, I believe, a half a million dollars from accounts having nothing to do with Hunts Point. They were from other projects, the actual indictment and the felony, the one felony charge he was incarcerated on. So who increased the invoices beyond the amount that they should have been? We don't know that, Your Honor, because we don't know that they were false. There's no testimony specifically that these invoices were false, that amounts were ---- because Hunts Point kept paying. Were they predated? No, the invoices weren't predated. Three of the notices of purchase had some dates that were prior, but the fundings that Madison made were never made until the notices of purchase were signed. And the fundings always came after the notices of purchase. Mr. Sneddon also testified that he always had, that his normal practice was that he wouldn't approve the funding without the invoice, without the notices of purchase signed by the account debtor. So that practice stayed in place throughout. And, again, I want to, again, come back to your question. What Mr. McGuire did was not induce any conduct on the part of Hunts Point. Hunts Point made payments to Westway, and at the end, Westway endorsed checks over to Mr. McGuire's company, Service Capital, which was a theft of funds due to Madison. This isn't a case where a principal or an agent or an employee of a principal in the normal course of business goes out to a third party, engages them in some transaction, and then steals the money for itself. Here, there was no direct privity between McGuire and Hunts Point. Hunts Point paid Westway. That's it, Westway, not Mr. McGuire, not Madison, even though Hunts Point was obligated by contract under each of the notices of purchase only to pay Madison. So why didn't Madison, after the first payment was made, say you have to pay us, don't pay Westway? That's a good question. I can't answer that except that Madison was getting monies. It was getting paid. It had to follow its own rules, and its own rules were that the – I can't think of the names of the parties in the transaction – were that Hunts Point had to pay it, and it took the money, but the money wasn't coming from Hunts Point, but the money was coming from Westway. Then why shouldn't it have immediately say, hey, something's wrong here. There's something wrong here. I'm not sure I can figure it out, but there's something wrong here. Right. Because no one – the party – you asked the policy, where should the risk lie, and I think it's a very important – the risk should lie with Hunts Point, because they are the ones that are in the best and perhaps the only position to know where the problems are. This was made clear in the context of factoring in the Northern District of California decision in the Gold Circle stores case in 1982. We cite it in our brief because it's a helpful analogy. There was a factoring situation where the factor brought accounts receivable due to a freight carrier, where it turned out that the underlying bills, the freight bills, were fraudulent, and there the court upheld the financier's collection of the accounts, specifically emphasizing that a factor is not like a bank who relies on the credit worthiness and the bona fides of its customer, but rather looks to the account debtor's experience with the assignor. Now, Madison had no experience with this construction project. This was a huge project. It was funded by city and state agencies. It had to rely on Hunts Point. That's the nature of the factoring business. It's fundamental, and this is a key part of the way a lot of markets get funded in this country is through factoring. And you must look to the bona fides and the credit worthiness of Hunts Point. In fact, Mr. Stedman ran a credit check of Hunts Point to help verify that Madison was comfortable taking Hunts Point's contractual promise to pay, admitting every time that this specific amount is due and owing without waiver, defense, offset, or counterclaim. Let me ask you this. Yes. There is a claim that at least $264,000 that was paid to Westway, and then it was apparently signed over by... It was endorsed to service capital. Yes. Why shouldn't they at least, if you're correct on your argument, why shouldn't they at least get credit for that $264,000? Well, actually, I think it was a little bit more than that, and there was another $200,000 payment that Madison got. I think it was a cashier's check, which Madison did credit. So, actually, the net amount is a hundred-some-odd thousand if you net it out, and that's in the district court's opinion. And the answer is because the monies were paid to Westway. Westway did not remit that monies to Madison, and instead remitted it, whether it's conspiracy or whatever with Mr. McGuire, who knows, remitted it to McGuire's company, and he stole the money. That was not in the furtherance of Madison's business. That was a criminal act, and Hunts Point did that at its own risk. And, again, to answer your question, to go back to your question just a little bit, if Hunts Point paid someone other than Madison, it did so at its own risk, and it said so in each of the notices of purchase. It even had a provision in Madison's underlying account purchase agreements, which is in the record, with Westway, that any monies Westway came into possession of had to be held in trust for Madison. And those account receivable purchase agreements are in the record, Your Honor, as well, at pages A904 and A914. So I think when all is said and done, the district court properly found that each of the notices of purchase were valid contracts, and thus did not have to assess any bona fide purchase of defenses under 9403, because they don't apply. Am I correct that the NOPs that were received by Hunts Point were not accompanied by invoices? Well, it's sort of a mystery in the case, Your Honor. Mr. Sneddon said that his policy was that the invoices would be attached, but when they came back, they were not attached. And Mr. Reingold didn't recall that the invoices were attached, but he did admit, and district court found, that the dollar amount, the specific dollar amount of each account was on the face of each of the NOPs. Yeah, it did match eventually. Yes, the dollar amounts in the NOPs matched the invoices that Madison had been presented with, excuse me, Your Honor, by Westway. But does that irregularity in the invoices not accompanying the NOPs, does that change the legal? It doesn't change my answer, Your Honor, or the district court's decision. If under a breach of contract theory, it doesn't, because that goes to Hunts Point's argument, the requisition was material. It wasn't material here where all I'm buying is a dollar amount of an account. This is not like a case where I'm selling potatoes, okay, where the purchase price or the amount of goods that I'm going to purchase, and that's the Gordon Tantrum case, the Hunts Point case. This is not a sale of goods case where price, quantity, and delivery time are material terms, things we learn in law school. This is a factoring case where I'm buying a specific, I'm buying your obligation to pay me this amount, this dollar amount, and you're vouching that this amount is due without defenses. And that's what the district court found, and we submit that that was proper. I'd like to, because I only have a couple minutes, briefly address the prejudgment interest on our appeal. I recognize that abuse of discretion is a difficult standard, and I respectfully submit in this case, though, that the district court did abuse its discretion in failing to award prejudgment interest once damages were awarded on a breach of contract theory. And I cite the Sones Court's decision in the Pulido case, which emphasized that under New Jersey law, certainly when you're dealing with liquidated sums like these, prejudgment interest is not avoided by honest disputation over legal liability, nor where even the defendant in good faith has contested the validity of the claim. So Hunts Point's argument that their own good faith should have been considered here is not the relevant consideration. And what the district court did, if I may continue for 30 seconds, what the district court did, it took, it recognized this principle and didn't follow it. Instead, it said, I'm going to look at your reliance damages, not your contract damages, and I'm just going to say, because that's 200-some-odd thousand and not your actual contract damages of a million ten, I'm just not going to award you prejudgment interest. With respect, it's not, one doesn't flow from the other. And that discretion has to be in the context of the grounds upon which you got the award in the first place. Here it was a common law breach of contract claim. The law in New Jersey is clear that absent some inequitable conduct on the part of the judgment creditor who delayed enforcement, or in the case of the Bacalume case, which Hunts Point cited, a judgment was entered against the defendant, the count to claim it, and the count to claim it was thus properly denied prejudgment interest. Thank you, Your Honor. Roberts. Thank you, Mr. Wernick. Mr. Perkins. In answer to Judge Fischer's question, the record does show that the invoices were not attached. I'm sorry, Judge Sirica. The district court found and credited Mr. Rheingold's testimony that he signed single sheets of paper. You can also tell from the fax taglines of the documents that they were received by Madison Financial at different times. And as I mentioned before, some of the invoices are dated after the notices of purchase. So I think there is evidence and there was a finding that he had signed these single sheets of paper. As to the first argument that Madison made on this appeal, which was not briefed in the brief, that the face of the statute shows that it doesn't apply to common law claims, well, it doesn't say that at all. What the statute says is that 9403B provides that an agreement between an account debtor and an assineur not to assert claims or defenses, that's what the notice of purchase is. It's signed by three people. So it's the account debtor, the assinee, and the assineur. They also say no case law for that position. We cite two cases, the 21st Capital case, which again was decided last year by the New Jersey Superior Court, and a decision of Judge Walls just last year, in which he acknowledged that it seemed to be that Article 9 would apply to these types of transactions. And that is in the Capital Plus equity case that we cite as well in our brief. I'm surprised that there's some confusion over this issue. You would have thought that this would have been pretty firmly established one way or the other. Well, I agree with that. And, Judge, I'll go back to the original citation that I made to 9109A3. It expressly says that the chapter applies to a sale of accounts. I don't think you can be any more clear than that. In terms of how this applies, the commentary that they cite to, what it says is it doesn't replace the common law, but it doesn't say it's superseded by the common law. And again, in this 21st Capital Corp case that we heavily rely on and invite the Court to read, we put in the complaint in that case because there was an argument made in Madison's opposition brief that that case didn't concern common law contract claims. That complaint, that's all it is, is common law contract claims. And the Court applies 9403 in that case. So it does apply to common law breach of contract claims. And again, that was a fundamental error of the lower court. In terms of consideration, the contractor did have a preexisting duty to perform its services. We rely on a case Schaeffer v. Brunswick, which we believe is directly on point. It's cited in our brief where it says that when an owner of a construction project promises a contractor funds, additional funds over and above what it owes, that that's not good consideration. And for all those reasons, I ask that the lower court decision be vacated first. Let me ask if my colleagues have any questions. Thank you. Any questions? Good. The case was very well argued by both of you. We'd like to have a transcript made of the oral argument and ask that you share it and check with the clerk's office, and they'll tell you how to do that. We'll do that. Let me also add to that that after you each get the reporter's transcript, before it gets sent to us, would you please read it? This is a technical case, so the court reporter may not be in a position to know all the technicalities. You can't change what you said, but be sure that it correctly states with the correct words that which you stated, otherwise we get a meaningless jargon. We will do that. Thank you. Thank you. Thank you. Thank you. Thank you.